UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:19-CV-00142-GNS-HBB

N. HARRIS COMPUTER CORPORATION, et al.                     PLAINTIFFS

v.

DSI INVESTMENTS, LLC, et al.                               DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiffs' Motion for Partial Summary Judgment (DN 100); Defendant's Motion for Partial Summary Judgment (DN 101); the parties' Joint Motions for Leave to Seal (DN 103, 120); Defendants' Motion for Leave to File Sur-Reply (DN 126); Plaintiffs' Cross-Motion for Leave to File Sur-Reply (DN 128); and Defendants' Motion to Strike (DN 129). The motions are ripe for adjudication.

## I.      STATEMENT OF FACTS AND CLAIMS

N. Harris Computer Corporation ("Harris Corp.") and its subsidiaries, Colossus, Inc. ("Colossus") and InterAct911 Corporation ("InterAct") (collectively "Plaintiffs") develop and market software programs. (Third Am. Compl. ¶¶ 11-13, DN 61). One of Plaintiffs' software products—JailTracker—provides jail management services to detention facilities. (Third Am. Compl. ¶ 12). JailTracker was originally developed in 2002 by Defendant David C. Ogles ("Ogles") who registered the copyright with Defendant Digitech Services, Inc. ("Digitech"). (Third Am. Compl. ¶¶ 14-15). In February 2012, Ogles, Digitech, and Digitech Public Safety Solutions ("DPSS") (collectively "Defendants") sold JailTracker to InterAct for $4.5 million pursuant to the terms of an Asset Purchase Agreement ("APA"). (Third Am. Compl. ¶ 16). As part of the APA, Ogles executed a Confidentiality, Assignment of Inventions, Non-Competition

and Non-Solicitation Agreement (the "2012 Agreement").  (Third Am. Compl. ¶ 17).  The 2012

Agreement includes an Assignment of Inventions provision ("Assignment") that was to remain in

force for the duration of Ogles' employment with Plaintiffs and for one year after that employment

ended.  (Pls.' Mot. Partial Summ. J. Ex. F, § 4, DN 100-7 [hereinafter 2012 Agreement]).

When InterAct acquired JailTracker, Ogles became an employee of an affiliated company,

Colossus, as the Vice President of Operations working primarily with JailTracker.[1]  (Third Am.

Compl. ¶ 20).  In late 2018 and early 2019, Ogles' relationship with his supervisor Andrew Wright

("Wright") began to deteriorate.  (Ogles Decl. ¶ 4, DN 18-1).  Ogles was fired on March 26, 2019.

(Ogles Decl. ¶ 18).  Shortly after his separation from Plaintiffs, in May and June 2019, Ogles used

software developers at Veepal IT Services Pvt. Ltd. ("Veepal") in India to develop a new jail

management software system called E-Jail.  (Ogles Decl. ¶¶ 22-25).  By mid-June 2019, Ogles had

created a functional diagram for E-Jail and sent it to Veepal, which started writing code for the

program on or about June 24, 2019.  (Ogles Decl. ¶¶ 24, 26).  Plaintiffs brought this action in

October 2019.  (Compl. DN 1).  The Court granted Plaintiffs a preliminary junction prohibiting

Defendants from soliciting and selling E-Jail to any of Plaintiffs' customers until March 2020 per

the 2012 Agreement.  (Order 13, DN 25).  Plaintiffs' Motion to Toll Enforcement of the

preliminary injunction (DN 42) was later denied.  (Order 4, DN 98).  Plaintiffs and Ogles have

filed dueling motions for partial summary judgment.  (DN 100, 101).

## II.    JURISDICTION

This Court has jurisdiction over "any civil action brought in a State court of which the

district courts of the United States have original jurisdiction" that is "removed by the defendant or

the defendants, to the district court of the United States for the district and division embracing the

---

[1] Harris is the parent company for both InterAct and Colossus.  (Third Am. Compl. ¶ 13).

place where such action is pending." 28 U.S.C. § 1441(a). This Court has "original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . the citizens of different States . . . ." 28 U.S.C. § 1332(a)(1).

### III.   DISCUSSION

#### A.   Motions for Partial Summary Judgment

##### 1.   *Ownership of E-Jail*

Plaintiffs and Defendants both move for summary judgment regarding whether InterAct owns E-Jail by virtue of the Assignment. (Pls.' Mem. Supp. Mot. Partial Summ. J. 10, DN 100-1; Def.'s Mem. Supp. Mot. Partial Summ. J. 21, DN 101-1). Plaintiffs argue that the Assignment is fully enforceable and that InterAct owns E-Jail under the terms of the Assignment because E-Jail is related to Ogles' work at InterAct and was developed within a year after Ogles' employment with InterAct ended. (Pls.' Mem. Supp. Mot. Partial Summ. J. 10). Defendants contend that the Assignment is overbroad and unconscionable which renders it unenforceable. (Def.'s Mem. Supp. Mot. Partial Summ. J. 21). This Court previously held that the 2012 Agreement between Ogles and InterAct is likely generally enforceable, although the Assignment was not at issue in that decision. (Order Granting Prelim. Inj. 4-8, DN 25). The question currently before the Court is the enforceability of the holdover provision in the Assignment.

The Assignment of Inventions provides that Ogles assigned to InterAct all of his interests in any "inventions", defined as:

> [A]ny and all inventions, developments, discoveries, improvements, work of authorship, concepts or ideas, or expressions thereof, whether or not subject to patents, copyright, trademark, trade secret protection or other intellectual property right protection (in the United States or elsewhere), (i) that are developed by me during my employment with InterAct Public Safety Systems and (ii) that are developed within one (1) year following termination of such employment which

3

> relate to any actual or  anticipated business, work, research or investigation for InterAct Public Safety systems, or which are suggested by or result from tasks assigned to or performed by me for InterAct Public Safety Systems.   This Agreement does not apply to inventions that are or have been developed entirely by me on my own time without use of our facilities, supplies, equipment or Confidential Information, and which do not relate to any actual or anticipated business, work, research or investigations for InterAct Public Safety Systems . . . .

(2012 Agreement ¶ 4.2).  As applicable here, the Assignment applies to (1) tangible embodiments of Ogles' ideas, (2) created by him within one year after his employment ended (3) that are related to InterAct's business.  (2012 Agreement ¶ 4.2).  The E-Jail program, developed by Ogles soon after leaving his employment with Plaintiffs and which is a jail management system ("JMS") just like JailTracker, falls squarely within the definition of "inventions" under the Assignment. Defendants concede that E-Jail was developed within one year of Ogles' termination of employment at InterAct.  (Def.'s Mem. Supp. Mot. Partial Summ. J. 29).

Assignments of inventions are utilized to "prevent an employee from appropriating to his own use or to the use of a subsequent employer inventions relating to and stemming from work done for a previous employer."  *Dorr-Oliver, Inc. v. United States*, 432 F.2d 447, 452 (Ct. Cl. 1970).  Such assignments recognize "the fact of business life that employees sometimes carry with them to new employers inventions or ideas so related to work done for a former employer that in equity and good conscience the fruits of that work should belong to the former employer."  *Id.* When a contractual provision, like the Assignment at issue here, requires an employee to assign inventions created after the employment ends, they are known as "holdover provisions."  *See Ingersoll-Rand Co. v. Ciavatta*, 542 A.2d 879, 887-88 (N.J. 1988).  The parties agree that North Carolina law governs the interpretation, validity, and enforcement of the Assignment.  (Order Granting Prelim. Inj. 4; 2012 Agreement ¶ 8).  Both parties also recognize that there are no reported

North Carolina decisions addressing the validity of an assignment of inventions in a similar context, or in any other context for that matter.

Holdover provisions are a type of restrictive covenant, which are carefully scrutinized under North Carolina law. *ChemiMetals Processing v. McEneny*, 476 S.E.2d 374, 376 (N.C. Ct. App. 1996); *Asheboro Paper & Packaging, Inc. v. Dickinson*, 599 F. Supp. 2d 664, 671 (M.D.N.C. 2009).[2]  Non-compete provisions, another form of restrictive covenant, are enforceable in North Carolina if reasonable. *Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC*, 784 S.E.2d 457, 461 (N.C. 2016).  To determine whether a restrictive covenant is reasonable in the context of the sale of a business courts consider three factors: (1) whether the covenant is reasonably necessary to protect the legitimate interest of the purchaser; (2) whether the covenant is reasonable with respect to time and territory; and (3) whether the covenant interferes with the

---

[2] As cited by both parties, North Carolina has an assignment of inventions statute which provides:

> Any provision in an employment agreement which provides that the employee shall assign or offer to assign any of his rights in an invention to his employer shall not apply to an invention that the employee developed entirely on his own time without using the employer's equipment, supplies, facility or trade secret information except for those inventions that (i) relate to the employer's business or actual or demonstrably anticipated research or development, or (ii) result from any work performed by the employee for the employer.  To the extent a provision in an employment agreement purports to apply to the type of invention described, it is against the public policy of this State and is unenforceable.  The employee shall bear the burden of proof in establishing that his invention qualifies under this section.

N.C. Gen. Stat. Ann. § 66-57.1 (West 1981).  The Assignment appears to have been tailored to avoid running afoul of this statute.  The statute invalidates assignments for inventions created on the employee's own time unless the assignment (1) relates to the employer's business, or (2) relates to the tasks assigned to the employee.  *Id*.  As discussed above, Ogles' development of E-Jail was directly related to InterAct's JailTracker business.  Because the Assignment is specifically limited to inventions related to Ogles' work for Plaintiffs, it is not invalid under this statute.

interest of the public.  *Id.*; *see also Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC*, 784 S.E.2d 457, 461 (N.C. 2016) (citation omitted).

In *Ingersoll-Rand v. Ciavatta*, 542 A.2d 879 (N.J. 1988), the New Jersey Supreme Court faced a similar dearth of case law dealing with the validity of a holdover assignment by adapting its non-compete analysis, an approach suggested by Ogles.  (Def.'s Mem. Supp. Mot. Summ. J. 8).  "In view of the competing interests involved in holdover agreements, courts have not held them void *per se.*  Rather, the courts apply a test of reasonableness."  *Ingersoll-Rand*, 542 A.2d at 887.  When reasonable, hold-over assignments serve the legitimate purpose of "prevent[ing] an employee from appropriating to his own use or to the use of a subsequent employer inventions relating to and stemming from work done for a previous employer."  *Id.* at 891 (citation omitted). The court in *Ingersoll-Rand* recognized the need to balance the interests of the employee and the public, "giving employers that limited measure of relief within the terms of the noncompetitive agreement which would be reasonably necessary to protect his legitimate interests, would cause no undue hardship on the employee, and would not impair the public interest."  *Id.* at 892 (internal quotation marks omitted) (citations omitted).  "[A] court will find a noncompetition covenant reasonable if it simply protects the legitimate interests of the employer, imposes no undue hardship on the employee and is not injurious to the public."  *Id.* at 888 (internal quotation marks omitted) (citation omitted).  The court looked at three factors:  (1) whether the scope of the assignment is not greater than necessary; (2) whether the assignment is unduly harsh or oppressive to the employee; and (3) whether the restraint is injurious to the public.  *Id.* at 887-88.

Applying this analysis, it must first be determined whether the holdover provision was reasonably necessary to protect InterAct's purchase of JailTracker.  InterAct paid Ogles $4.5 million for JailTracker, which included the Assignment and non-compete obligations imposed

upon Ogles for a period of one year after the end of his employment.  (Third Am. Compl. ¶ 16).

In the context of non-compete agreements, North Carolina courts have upheld one-year terms of

such agreements.  *See, e.g.*, *Precision Walls, Inc. v. Servie*, 568 S.E.2d 267, 273 (N.C. Ct. App.

2002) (citing *Enters., Inc. v. Heim*, 173 S.E. 316 (N.C. 1970); *Clyde Rudd & Assocs., Inc. v. Taylor*,

225 S.E.2d 602 (N.C. Ct. App. 1976)).  In granting Plaintiffs' Motion for a Temporary Restraining

Order, the Court previously held that the one-year non-compete was not unreasonable.  (Order

Granting Prelim. Inj. 7, DN 25); *see Snider Bolt & Screw, Inc. v. Quality Screw & Nut*, No. 3:05-

CV-738-H, 2009 WL 1657549, at *1 (W.D. Ky. June 12, 2009) (upholding a non-compete

provision as "quite reasonable" where the "prohibitions are limited to one year and to work or

employment specifically adverse to [the company], which competes in a highly specialized and

unique industry.").  These types of protections are common in business purchases and prevent the

former owner from leaving the buyer's employment and going directly into competition. Given

the considerable investment made by InterAct and the apparent relative ease with which Ogles was

able to develop an alternate JMS product, a one-year holdover assignment term appears to have

been a reasonable protection afforded to the purchaser.  Also, given that the one-year assignment

term matches Ogles' non-compete restriction which has already been upheld, this term does not

appear to be greater than necessary to protect Plaintiffs' legitimate business interests.

Next, the Assignment is reasonable in that it is not unduly harsh or oppressive to Ogles.

*Ingersoll-Rand*, 542 A.2d at 890.  In *Ingersoll-Rand*, the court emphasized that whether such an

assignment is unduly harsh or oppressive is a fact-intensive analysis:

> How restrictive the clause is on a particular employee depends, of course, on the
> facts and circumstances of the case.  Indeed, in many instances, the employee may
> have little choice but to sign a holdover agreement in order to secure employment.
> Conversely, some very talented or experienced individuals, pursued by several
> corporations, may bargain for highly lucrative positions in exchange for their
> promise to be bound by a holdover agreement.  Accordingly, courts must evaluate

> the reasonableness of holdover agreements in light of the individual circumstances
> of the employer and employee.

*Id.* at 894.  In terms of personal hardship to Ogles, he has successfully developed and sold software

products other than JMS programs, meaning that he is still able to use his general software, design,

and marketing experience to earn an income during the holdover period for a wide array of

businesses, other than selling JMS to InterAct customers.  (Ogles Dep. 14:16-25, DN 107-3).

Ogles also operates a weapons business and a cattle ranch, and owns commercial property—

including space leased to Plaintiffs—giving him other streams of income during this time as well.

(Ogles Dep. 305:14-306:25, DN 101-4).  Given Ogles' successful business ventures and the

substantial payment received from the sale of JailTracker, there is no indication that enforcement

of the Assignment would be unduly burdensome to him.

Finally, the public interest does not significantly militate against enforcement of the

Assignment.

> [T]he public has a clear interest in safeguarding fair commercial practices and in
> protecting employers from theft or piracy of trade secrets, confidential information,
> or, more generally, knowledge and technique in which the employer may be said to
> have a proprietary interest.  The public has an equally clear and strong interest in
> fostering creativity and invention and in encouraging technological improvement
> and design enhancement of all goods in the marketplace.

*Ingersoll-Rand*, 542 A.2d at 894-95 (citation omitted).  The public's interest in safeguarding fair

commercial practices and protecting employers' intellectual property rights weighs in favor of

enforcing the Assignment, while the public's interest in fostering creativity and inventions weighs

against enforcement.  The public's interest does not weigh strongly for or against enforcement and

is therefore considered to be a neutral factor.

Defendants argue that the Assignment is unconscionable because it is too broad.  (Def.'s

Mem. Supp. Mot. Partial Summ. J. 23).  As with the Temporary Restraining Order, the assignment

as applied to E-Jail is not overbroad.  There is no question that E-Jail is directly related to the work Ogles performed by the business that he sold to Plaintiffs and performs identical functions as JailTracker.  Given the similar functions of the JailTracker and E-Jail programs and their target market, the Assignment as applied to the present facts appears to be reasonably tailored to Plaintiffs' interests when JailTracker was purchased from Ogles.  Further, Defendants' contention that the Assignment is overbroad and unenforceable is refuted by the fact that North Carolina has statutorily established parameters for impermissible invention assignments coupled with the Assignment provisions which do not run afoul of the statute as discussed above.  Therefore, the Assignment is effective, and Plaintiffs are entitled to ownership of E-Jail.

### 2. *Kentucky Uniform Trade Secrets Act ("KUTSA")*

#### a. **Ogles' Motion**

Ogles moves for summary judgment on the KUTSA claim on the basis that Plaintiffs have not identified with particularity which of JailTracker's trade secrets they allege Ogles misappropriated.  (Def.'s Mot. Partial Summ. J. 19).  To prevail on this claim, Plaintiffs must show that:  (i) a trade secret exists; and (ii) that trade secret has been misappropriated.  *See Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F. Supp. 2d 784, 794 (W.D. Ky. 2001) (citing KRS 365.880).  To establish the existence of a trade secret first "[p]laintiff must put forward evidence demonstrating that the information (1) has independent economic value, (2) is not readily ascertainable by proper means, and (3) was the subject of reasonable efforts to maintain its secrecy."  *Nat'l Info. & Commc'ns Equip. Network, Inc. v. Willigan*, No. 06-28-DLB, 2007 U.S. Dist. LEXIS 75799, at *22 (E.D. Ky. Oct. 11, 2007) (citing KRS 365.880).  "[I]t is not enough merely to show that the information is entitled to protection.  Rather, Plaintiff must also show that the protected information has been misappropriated."  *Id.* at 22-23 (citation omitted).  "To prove

misappropriation, Plaintiff must show that the trade secret was acquired by improper means, was disclosed improperly, or was used by someone without proper consent." *Id.* (citation omitted). On summary judgment, the burden is on the plaintiff to "show the existence of a trade secret with reasonable degree of precision and specificity . . . such that a reasonable jury could find that plaintiff established each statutory element of a trade secret." *Dow Chem. Can., Inc. v. HRD Corp.*, 909 F. Supp. 2d 340, 346-47 (D. Del. 2012) (internal quotation marks omitted).

Plaintiffs must "first identify with specificity the trade secrets it accuses [Ogles] of misappropriating." *Marine Travelift, Inc. v. Marine Lift Sys., Inc.*, No. 10-C-1046, 2013 WL 6255689, at *5 (E.D. Wis. Dec. 4, 2013) (citation omitted). Stated differently:

> It is not enough for a plaintiff to generally describe the kind of information it claims as a trade secret or explain why it is valuable. The party asserting such a claim must tell the party it accuses of misappropriating its trade secret specifically what the secret is. If it does not, how can the other party defend itself?

*Encap, LLC v. Scotts Co.*, No. 11-C-685, 2014 WL 4273302, at *4 (E.D. Wis. Aug. 28, 2014) (citation omitted). "[Plaintiffs] cannot avoid [their] obligation to carefully delineate precisely what in fact remains secret by designating 'all' of [their] source code as secret." *PaySys Int'l, Inc. v. Atos Se*, No. 14-CV-10105 (KBF), 2016 WL 7116132, at *11 (S.D.N.Y. Dec. 5, 2016).

Plaintiffs identified their trade secrets in discovery as follows:

> [The] trade secrets at issue are the JailTracker software and related documentation ("JailTracker Software"), including the following information regarding the JailTracker Software developed and refined over many years at substantial effort and expense: (i) computer software (object and source codes), programming techniques, functional methods, procedures, algorithms, know-how, workflows, data/databases, schema, entity relationship models, data codings, and system designs embodied in the JailTracker Software, and (ii) discoveries, inventions, designs, flow charts, documentation, product research, product plans, market research, product specifications, application program interface specifications, business processes, related know-how, and other information relating to the JailTracker Software and its past and contemplated development and refinement. Plaintiffs identify such trade secrets both individually and as combination/compilation trade secrets. With that said, during the course of Ogles'

employment, Ogles learned substantial trade secrets of Plaintiffs, including but not limited to Plaintiffs' product pricing, proprietary information regarding Plaintiffs' product offerings and plans for future offerings, marketing plans, forecasts, and other business strategies.

(Pls.' Resp. Def.'s Mot. Partial Summ. J. Ex. D, at 3, DN 110-4).  Plaintiffs then assert that the testimony of Wright ("Wright"), Ogles' former boss, further elaborates upon what specifically constitutes their trade secrets.  (Pls.' Resp. Def.'s Mot. Partial Summ. J. 9-10, DN 110).  Wright testified that all intellectual property associated with JailTracker was a trade secret.  (Wright Dep. 174:6-9, Dec. 15, 2020, DN 113-2).  Wright further stated:

> Q      What do you mean by, "IP"?  Do you mean the code?
> A      It is—no, the—the code is just one part of the product.  I—intellectual property extends to the design, the requirements that were gathered to create the design.  It's all of the knowledge that went into creating JailTracker over 20 years, and it was sold as part of the acquisition.  Mr. Ogles, he admitted that he developed a competing product with knowledge of E-Jail and JailTracker.  So we consider that a violation under the 2012 agreement with that.

(Wright Dep. 169:6-16, Dec. 15, 2020, DN 113-2).  Wright was repeatedly asked to specify Plaintiffs' trade secret claim and he consistently responded by claiming as a trade secret "everything about the product" and the amount of time that went in to developing it.  (Wright Dep. 170:21-25-171:1-24).

Plaintiffs did provide some specificity regarding the trade secrets through two declarations from Wright and Dalton Jones ("Jones"), Director of Research and Development at N. Harris, albeit only in response to Ogles' motion for partial summary judgment.  (Pls.' Resp. Def.'s Mot. Partial Summ. J. Exs. E to F.1, DN 111-1 to 111-3).  Wright's supplemental declaration states:

> 5.      . . . JailTracker's workflow feature allows agencies to create and figure a multitude of workflows based on specific tasks, such as booking, releasing, and classification.  The booking information tab provides users with particular fields requested by administrators to assure staff collects the appropriate information and includes several safeguards to ensure accurate reporting.  There is an automatic notifications module that allows users to create specific triggers that send notifications to groups and individuals.  The cell movement feature gives users the

11

ability to move inmates to different cell locations, as needed, and validates that information as well.   JailTracker also includes a questionnaire function that provides agencies with the ability to create and maintain unlimited questionnaires for processes.   JailTracker has several tools to verify identify during the intake process, including facial recognition technology and the ability to run a comprehensive database search across various identifying fields.   JailTracker contains the ability to maintain and view charges and corresponding information, including historical information for particular inmates.   There is also the ability for agencies to create custom data collection forms and generate custom reports.   One key feature in JailTracker is the "Virtual Grease Board" which was developed as a result of customer feedback and moves the facility layout and inmate cell assignments into a user-friendly, digital environment.   There are also tabs and features for property intake, sentencing, holders/detainers, housing/billing, the ability to run over 600 reports in the areas of inmate records, facility, and accounting, various clarification/assessment structures, and the functionality to schedule inmate and staff training and record attendance and pass/fail status. JailTracker has a visitation module that allows users to record offender visits from friends and family.   JailTracker has a unique wizard to guide users through data collection throughout the booking and release processes.
. . .
8.      One feature that was added to JailTracker during its development at Colossus Incorporated was the functionality of the product to be able to allow the customer to create their own forms within the application.   This feature was developed as a result of input and comments from customers, which Colossus, Inc. had learned in the course of developing and selling the JailTracker software and which Plaintiffs consider to be trade secret information.

(Wright Decl. ¶¶ 5, 8, DN 111-1).  Plaintiffs also point to JailTracker's "Virtual Jacket" as part of

their trade secret claim, which is "a proprietary method of data sharing between jails."  (Wright

Decl. ¶ 9).

Plaintiffs purport to use Wright's declaration to provide specificity regarding claimed trade

secrets after failing to provide such specifics during discovery, tendering the declaration only after

Ogles moved for summary judgment.  (Wright Dep. 174:6-9).  "A party may not create a factual

issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts

her earlier deposition testimony."  *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986)

(citation omitted).  "[T]he fact that a party has had ample opportunity during discovery to present

evidence provides courts with reason to prevent that party from introducing new evidence in an

affidavit opposing summary judgment." *Lockard v. Gen. Motors Corp.*, 52 F. App'x 782, 789 (6th Cir. 2002) (citation omitted).  As the court stated in *Rosinski v. Electric Data Systems Corp.*, No. 90-2133, 1991 U.S. App. LEXIS 13274 (6th Cir. June 18, 1991), "the affidavit attempts to create an issue of fact, where none had existed prior to the affidavit, on a subject that Rosinski testified to at great length and at a time when he had the opportunity to fully develop a record in support of his claim." *Id.* at *20.  When asked for specificity in his deposition testimony, Wright continued to aver that all of the intellectual property related to JailTracker was its trade secret.  Wright cannot be allowed to bolster his overbroad and nebulous trade secrets testimony by providing additional specificity after the fact.

Jones' declaration provides the schema for JailTracker from 2014, and states that "[t]he JailTracker software has gone through thousands of hours of development, including writing over 69,000 lines of source codes, managing bug fixes, and preparing new features for customers." (Jones Decl. ¶ 4, DN 111-2).  Plaintiffs attached a 200-page document showing the schema without discussion of what constitutes a trade secret or why the schema itself is a trade secret, other than reciting the amount of time that went into creating it.  In *IDX Systems Corp. v. Epic Systems Corp.*, 285 F.3d 581 (7th Cir. 2002), the court noted:

> IDX's tender of the complete documentation for the software leaves mysterious exactly which pieces of information are the trade secrets. . . . [A] plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition.

*Id.* at 584 (internal citation omitted).  In an action where the plaintiff produced a 43-page document describing its software, the court found that the pages merely "describe the software; although the document was created for this litigation, it does not separate the trade secrets from the other information that goes into any software package.  Which aspects are known to the trade, and which

13

are not?" *Id*. In this instance, simply providing the software schema does not sufficiently identify what aspect of the software is a trade secret.

In *Babcock Power, Inc. v. Kapsalis*, No. 3:13-CV-717-CRS, 2017 WL 1206012 (W.D. Ky. Mar. 30, 2017), this Court rejected a broad claim of trade secret, noting that the plaintiff "provid[ed] a final list of Bates numbered documents, a comparison view document which identifies all additional changes made to the prior list, and a separate sealed compendium of those documents which contain both trade secret and non-trade secret information, with the trade secret material highlighted." *Id*. at *5; *see also KCH Servs., Inc. v. Vanaire, Inc.*, No. 05-777-C, 2008 WL 4401391 (W.D. Ky. Sept. 24, 2008) (plaintiff claimed 12 of 200 software programs were trade secrets where the defendant wrote the code for a narrow function of the software). Plaintiffs, on the other hand, claim such a broad swath of information, such as the marketing strategies, pricing methods, and business strategies, boldly claiming that this general information constitutes a trade secret. (Wright Dep. 171:3-9).[3]

In *Marine Travelift*, the plaintiff designated as a trade secret, "'structure information/design criteria;' 'engineering calculations;' 'steering information and specifications/design criteria;' 'duty cycle criteria and information;' 'performance testing data;' and 'safety factors in machine and components.'" *Marine Travelift*, 2013 WL 6255689, at *6. The district court, interpreting a statute similar to KUTSA, found that the plaintiff's vague descriptions deficient, stating:

> [It] is unreasonable and unfair to force a defendant to trial without even knowing specifically what information the plaintiff claims constitutes the trade secrets the defendant is alleged to have misappropriated. It is unreasonable because if a plaintiff cannot identify the information the defendant disclosed and demonstrate

---

[3] Even with the more recent declarations from Wright and Jones, Plaintiffs still assert that the entirety of the JailTracker program is a trade secret—not just the specific components of JailTracker to which they point. When asked in his deposition if the schema specifically was the claimed trade secret, Wright replied that the schema is in all of JailTracker, essentially maintaining the entirety of JailTracker is a trade secret. (Wright Dep. 172:16-22).

> that it can offer evidence from which a jury could conclude the information constitutes a trade secret, there is no need for a trial.  It is unfair because a defendant should not have to guess what information the plaintiff claims was disclosed and see for the first time at trial the evidence the plaintiff has to prove it fits the definition of a trade secret.

*Marine Travelift*, 2013 WL 6255689, at *5.

Plaintiffs cite *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398 (6th Cir. 2006), which found a trade secret was sufficiently specified when the plaintiff sought to protect its design drawings and engineering plans, "including tolerances (the acceptable degree to which the completed part could deviate from the design dimensions), data and reference points, clearances, pivot points, spring tensions, and specific alloys—that cannot be determined by simply measuring the parts on a manufactured engine or looking at a picture." *Id.* at 410.  By contrast, Plaintiffs have offered no specificity and have not provided a narrowly defined description of what trade secrets comprise JailTracker, stating instead that "any IP relating to JailTracker" constitutes a trade secret. (Wright Dep. 169:1).  Plaintiffs also point to *XTec, Inc. v. Hembree Consulting Services, Inc.*, No. 14-21029-CIV, 2015 WL 3797165 (S.D. Fla. June 18, 2015), which found that while source code could be considered a trade secret, a plaintiff still "must describe the trade secret for which it seeks protection with sufficient particularity to permit Defendants the ability to ascertain the boundaries of the secret, [but] it need not specify the lines of source code that make up the trade secret." *Id.* at *11 (citation omitted).  Plaintiffs in this instance have provided no such particularity that would allow Ogles to determine the parameters of the trade secrets Plaintiffs claim with respect to JailTracker.  For this reason, Ogles' motion for partial summary judgment on Plaintiffs' KUTSA claim will be granted.

15

### b.        Plaintiffs' Motion

Plaintiffs also move for summary judgment on their KUTSA claim.  (Pls.' Mem. Supp. Mot. Partial Summ. J. 17).  Plaintiffs contend that because they own E-Jail, "they also own all trade secrets associated with E-Jail, and Defendants have misappropriated those trade secrets in violation of the Kentucky Uniform Trade Secrets Act."  (Pl.'s Mem. Supp. Mot. Partial Summ. J. 17, DN 104).  The threshold problem, however, is with the sufficiency of the Complaint.  As Ogles points out, "[t]he Third Amended Complaint alleges one claim for misappropriation of trade secrets, which relates to Plaintiffs' JailTracker software.  That claim contains no allegations relating to [E-Jail]."  (Defs.' Resp. Pls.' Mot. Partial Summ. J. 15 (internal citation omitted)).  Plaintiffs respond that they sufficiently pled E-Jail trade secrets because E-Jail is derivative of JailTracker and is therefore "part and parcel of the trade secrets associated with JailTracker."  (Pls.' Reply Mot. Partial Summ. J. 9, DN 117).  Plaintiffs' pleadings, however, contain no allegations asserting that E-Jail's trade secrets have been misappropriated by Defendants by virtue of Plaintiffs' ownership of E-Jail.  Specifically, the Third Amended Complaint alleges:

> 156.    As a previous employee/executive of Plaintiffs, Ogles was exposed to, among other things, marketing strategies, customer and/or client lists, prospective customer lists and information, pricing and fee elements, proprietary software and other non-readily obtainable information with Plaintiffs, including all confidential information regarding JailTracker's development, schema, design, features, processes, formulas, data, program documentation, drawings, and algorithms..[sic] Such information constitutes trade secrets under Kentucky law.
>
> 157.    Plaintiffs' trade secrets have economic value, as evidenced in part by the irreparable harm sustained by Defendants' solicitation of clients and resulting transfer of at least one JailTracker account.  These trade secrets are not generally known by Plaintiffs' competitors or the general public.

(Third Am. Compl. ¶¶ 156-57).   These allegations specifically mention JailTracker and misappropriation of the trade secrets associated with it.  (Third Am. Compl. ¶ 156).  Although

Plaintiffs now assert a theory of misappropriation resting entirely on their ownership of E-Jail due to the Assignment, Count 12 of the Third Amended Complaint makes no such claim.

"It is well-settled that the parties may constructively amend the complaint by agreeing, even implicitly, to litigate fully an issue not raised in the original pleadings." *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997) (citation omitted). Ogles has not acquiesced to litigate the issue, specifically pointing to the shortcomings of Count 12, which makes no mention of E-Jail's trade secrets. (Defs.' Resp. Pls.' Mot. Partial Summ. J. 15). Plaintiffs are most certainly not entitled to summary judgment on a claim of misappropriation by Defendants of E-Jail trade secrets which is not set forth in Plaintiffs' last amended pleading. Thus, Count XII is dismissed.

### 3.    *Breach of Fiduciary Duty and the Duty of Good Faith and Loyalty*

Ogles argues that there is no dispute of fact regarding Colossus' claims for breach of fiduciary duty (Count V) and breach of the duties of good faith and loyalty (Count VI). (Def.'s Mem. Supp. Mot. Summ. J. 14, DN 101-1). Plaintiffs aver that while still employed with Colossus, Ogles prepared to form E-Jail to compete with Colossus, and generally failed to act in the best interest of his employer. (Third Am. Compl. ¶¶ 105, 108, 113). "In order to prevail on a claim for breach of fiduciary duty, a plaintiff must establish that (1) the defendant owes a fiduciary duty to it; (2) the defendant breached that duty; and (3) the defendant suffered damages as a result of the breach." *Thornton v. W. & S. Fin. Grp. Beneflex Plan*, 797 F. Supp. 2d 796, 812 (W.D. Ky. 2011) (citation omitted).

In Kentucky, a fiduciary duty is one "founded on trust or confidence reposed by one person in the integrity and fidelity of another and which also necessarily involves an undertaking in which a duty is created in one person to act primarily for another's benefit in matters connected with such undertaking." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 485 (Ky. 1991).

"Kentucky courts are willing to find a fiduciary relationship between an employer and employee when the employee has a position of trust, the freedom of decision, and access to confidential corporate information." *Vivid Impact Co., LLC v. Ellis*, No. 3:17-CV-509-JHM, 2017 WL 5505024, at *3 (W.D. Ky. Nov. 16, 2017) (citation omitted).  A "mere employee" is not sufficient to establish fiduciary duties.  *Steelvest*, 807 S.W.2d at 483.  Those owing a fiduciary duty "should terminate their position/status as directors or officers when they first make arrangements or begin preparations to compete directly with the employer corporation." *Id.* (citation omitted).  The duties of good faith and loyalty "are essentially the same as the claim for breach of fiduciary duty . . . ." *Cap. Creation Co. v. Metro. Life Ins.*, No. 1:90-CV13-22, 1992 WL 218296, at *8 (N.D. Ohio Aug. 26, 1992).

Even accepted as true, Plaintiffs' version of the facts nevertheless is insufficient to support a claim that Ogles actually competed or prepared to compete with Plaintiffs before the termination of his employment.[4]  Plaintiffs state that Ogles spoke with Jones, asking "how long would it take to write another product like JailTracker" and after being told two years, Ogles responded that he "wanted something he could put out in six months." (Jones Dep. 86:13-19, Dec. 16, 2020, DN 110-1).  On this basis, Plaintiffs argue that Ogles must have begun work on E-Jail during his employment since he created the program less than six months after his employment ended.  (Pls.' Resp. Def.'s Mot. Partial Summ. J. 5, DN 110).  Ogles has submitted evidence that he authorized

---

[4] Ogles does not concede that he owed a duty to Plaintiffs, but also does not rebut Plaintiffs' argument of duty, instead focusing on the issue of breach.  (Def.'s Mem. Supp. Mot. Partial Summ. J. 15).  Ogles was a Vice President at Colossus and was later a Product Manager of Research and Development.  (Third Am. Compl. ¶ 28).  Ogles managed employees who dealt with the service and support of JailTracker.  (Jones Dep. 94:14-25-95:1-3, Dec. 16, 2020, DN 110-1).  He would "meet with potential customers, demo the product [JailTracker], and work through contract negotiations." (Jones Dep. 97:1-3).  While the evidence may indicate that Ogles owed a fiduciary duty to Colossus, such a determination is unnecessary because there is a clear absence of proof that Ogles breached any such duty.

the software developers in India to start work on E-Jail on June 18, 2019, and Plaintiffs have not pointed to any proof supporting the claim that Ogles' efforts on E-Jail began while he was still employed by Colossus.  (Defs.' Resp. Pls.' Mot. Prelim. Inj. Ex. C, at 1, DN 18-4).

Plaintiffs also state that Ogles took information from a file cabinet when he cleared out his workspace.  (Pls.' Resp. Def.'s Mot. Partial Summ. J. 17, DN 111).  Jones stated "the only thing that I'm aware of that he took, and I don't know what's included in that, was when he cleared out his office after termination, he also cleared out a file cabinet in Michelle Rigney's office", but Jones did not know the contents of those files.  (Jones Dep. 93:5-9).  An empty file cabinet after termination does not rise to the necessary level of persuasive circumstantial evidence in the absence of any proof whatsoever regarding what the cabinet contained.

Plaintiffs also allege Ogles took information relating to JailTracker from his laptop.  (Pls.' Resp. Def.'s Mot. Partial Summ. J. 5, DN 110).  Ogles admits he deleted his email profile from the laptop, but nothing else even though JailTracker was installed on the laptop.  (Ogles Dep. 298:1, 300:2-7, DN 118-4).  Jones, who examined the computer, testified that there was nothing remaining on the laptop other than the Microsoft operating system.  (Jones Dep. 83:3-5).  As a result, Plaintiffs argue Ogles took JailTracker from the laptop to use for his own business and cleared the laptop off to cover his tracks.  (Pls.' Resp. Def.'s Mot. Partial Summ. J. 5-6).  Defendants have presented affirmative evidence that Ogles made no effort to develop any JMS until months after his discharge, when he began communications with the programmers at Veepal in May 2019.  (Ogles Decl. ¶ 22).  While the deposition testimony conflicts, this dispute of fact is not material enough to warrant submission to the jury.  "[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact . . . ."  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  "The mere existence of a scintilla of evidence in support of the

plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* (citation omitted).  In this instance, a jury would only be left to speculate what Ogles may have taken and how he used that information to Plaintiffs' detriment.  Absent proof supporting a claim that Ogles breached a duty owed to Colossus, these claims must be dismissed.  Thus, Ogles' motion for partial summary judgment on Plaintiffs' claim for breach of fiduciary duty and the duties of good faith and loyalty will be granted.

### 4.     *Joint Motions for Leave to Seal*

In ruling on a motion to seal, the court "must balance the litigants' privacy interests against the public's right of access . . . . "  *Rudd Equip. Co., Inc. v. John Deere Constr. & Forestry Co.*, 834 F.3d 589, 594 (6th Cir. 2016).  "The public has an interest in ascertaining what evidence and records the District Court . . . ha[s] relied upon in reaching our decisions."  *Brown & Williamson Tobacco Corp. v. F.T.C.*, 710 F.2d 1165, 1181 (6th Cir. 1983).  There is a "strong common law presumption in favor of public access . . . . "  *Id.* at 1179.  The Sixth Circuit allows trade secrets to be filed under seal.  *See Shane Grp. v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299, 308 (6th Cir. 2016).  Commercially sensitive business information can also be filed under seal.  *See, e.g.*, *Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, No. 3:13-CV-82-CRS-CHL, 2017 WL 3220470, at \*5 (W.D. Ky. July 28, 2017) (sealing, in part, documents containing "[commercial] information that, if made available for its competitors to view, would put [the] [plaintiff] at a disadvantage in the marketplace.").

The parties have filed two joint motions to seal certain memoranda and exhibits.  (Joint Mot. Seal, DN 103; Joint Mot. Seal, DN 120).  Pursuant to the Amended Agreed Protective Order (DN 44), the parties may file under seal:

> (1)     The unredacted versions of the reply memoranda in support of their respective motions for partial summary judgment,

(2)     Defendants may file the Expert Report of Dr. John M. Strawn and the Supplemental Expert Report of Dr. John M. Strawn in their entirety;

(3)     The document labeled VE-2640 and the expert report of Monty Myers in their entirety, and any portions of the parties' motions and memoranda that reference or discuss those documents; and

(4)     The unredacted Asset Purchase Agreement and related deposition testimony, but the Parties are directed to file those items in the public records with the purchase price and payment amounts redacted.

(Joint Mot. Seal, DN 103; Joint Mot. Seal, DN 120).

The parties diverge with regard to sealing pages 168-174 of Wright's deposition and Exhibit 24 to Ogles' deposition.  (Joint Mot. Seal 10, 12, DN 103).  Plaintiffs allege that if the public were to gain access to the "detailed information" described in the deposition testimony then they could be exposed to financial harm or disadvantage.  (Joint Mot. Seal 11, DN 103).  Wright's testimony, however, consists of general statements about the amount of work and time that went in to developing JailTracker and then his description of the "schema."  (Wright Dep. 168:1-174:9).  Plaintiffs have not overcome the presumption of openness needed to permit sealing a portion of Wright's testimony.  Regarding Exhibit 24 to Ogles' deposition, however, there is more specific information regarding the creation of a jail management system.  (Ogles Dep. Ex. 24, at 1, DN 104-3).  At the least, this information contained rises to the level of sensitive business information.  (Ogles Dep. Ex. 24, at 1).  Thus, Exhibit 24 to Ogles' deposition may remained sealed in its entirety, but pages 168-174 of Wright's deposition transcript may not.  (Wright Dep. 168:1-174:9; Ogles Dep. Ex. 24, at 1).

### 5.     *Defendants' Motion for Leave to File Sur-Reply/Plaintiffs' Cross-Motion for Leave to File Sur-Reply*

Neither the Federal Rules of Civil Procedure nor the Court's local rules permit the filing of sur-replies.  "As many courts have noted, '[s]ur-replies . . . are highly disfavored, as they usually are a strategic effort by the nonmoving party to have the last word on a matter.'"  *Liberty Legal*

*Found. v. Nat'l Democratic Party of the USA, Inc.*, 875 F. Supp. 2d 791, 797 (W.D. Tenn. 2012) (alteration in original) (internal quotation marks omitted) (citation omitted).  Even so, granting leave to file a sur-reply may be appropriate in the district court's discretion when "a valid reason for such additional briefing exists, such as where the movant raises new arguments in its reply brief." *First Specialty Ins. Corp. v. 633 Partners, Ltd.*, 300 F. App'x 777, 788 (11th Cir. 2008) (citation omitted).  Defendants argue that they should be granted leave to file a Sur-Reply because Plaintiffs' response to Ogles' Motion for Partial Summary Judgment included new information. (Defs.' Resp. Pls.' Mot. Leave File Sur-Reply & Cross-Mot. Leave File Sur-Reply 1, DN 128). Plaintiffs correspondingly that they should be allowed to file their sur-reply because Ogles included new expert disclosures in his reply.  (Pls.' Mot. Leave File Sur-Reply, DN 126).  Ogles, however, only included this new information in his reply (DN 118) because Plaintiffs included new expert disclosures in their response (DN 111) to Defendants' Partial Motion for Summary Judgment (DN 101).  (Pls.' Resp. Def.'s Mot. Partial Summ. J. Exs. E to F.1, DN 111-1 to 111-3). Plaintiffs thus opened the door to the supplemental declaration by filing untimely expert testimony themselves.  Plaintiff cannot then expect to receive leave to file a sur-reply when the new information was only to respond to Plaintiffs' untimely evidence.  Additionally, Ogles already had the opportunity to respond to Plaintiffs' new evidence in his reply, and is thus not entitled to a sur-reply when he already had a chance to respond to Plaintiffs' new evidence.  (Def.'s Reply Mot. Partial Summ. J. 10-12).

### 6.   *Defendants' Motion to Strike*

Plaintiffs moved to strike the supplemental expert report of Dr. John M. Strawn.  (Pls.' Mot. Strike, DN 129; Def.'s Reply Mot. Partial Summ. J. Ex. 9, DN 121-2).  Under the parties' Agreed Order, the deadline for Plaintiffs to submit written reports from any expert witness was

February 9, 2021; the deadline for Defendants to submit written reports from any expert witness was March 26, 2021; and the deadline for motions related to the admissibility of expert testimony was May 27, 2021.  (Agreed Order, DN 94).  Defendants introduced the supplemental expert report of Dr. John M. Strawn on July 19, 2021 as part of their reply (DN 118) to Plaintiffs' response (DN 110) to Defendants' Motion for Partial Summary Judgment (DN 101).  Defendants argue that the untimely testimony should be allowed because it was introduced in response to Plaintiffs' 201-page schema and declarations from Wright and Jones in responding to Defendants' Motion for Partial Summary Judgment.  (Pls.' Resp. Def.'s Mot. Partial Summ. J. Exs. E to F.1).

The Court has broad discretion over whether to exclude untimely disclosed expert witness testimony.  *Matilla v. S. Ky. Rural Elec. Co-op. Corp.*, 240 F. App'x 35, 42 (6th Cir. 2007).  "The exclusion of non-disclosed evidence is automatic and mandatory under Rule 37(c)(1) unless non-disclosure was justified or harmless."  *Dickenson v. Cardiac & Thoracic Surgery of E. Tenn.*, 388 F.3d 976, 983 (6th Cir. 2004) (citation omitted).  Plaintiffs seek to strike Defendants' untimely expert testimony, when the testimony was introduced in response to untimely expert declarations Plaintiffs filed.  The Court finds that Defendants' untimely supplemental expert testimony was justified in light of Plaintiffs' expert declaration disclosures filed outside the established deadlines.[5]

---

[5] "After all, in the law, what is sauce for the goose is normally sauce for the gander."  *Heffernan v. City of Paterson*, 578 U.S. 266, 272 (2016).

## IV.   CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1.      Plaintiffs' Motion for Partial Summary Judgment (DN 100) is **GRANTED IN PART** and **DENIED IN PART**. Plaintiff's request for declaratory judgment with respect to ownership of E-Jail is **GRANTED**.

2.      Defendant's Motion for Partial Summary Judgment (DN 101) is **GRANTED IN PART** and **DENIED IN PART**.  Counts V, VI, and XII are **DISMISSED.**

3.      The parties' Joint Motion for Leave to Seal (DN 120) is **GRANTED**.

4.      The parties' Joint Motion for Leave to Seal (DN 103) is **GRANTED IN PART** and **DENIED IN PART**.  Exhibit 24 to Ogles Deposition (DN 104-3) shall be sealed, but pages 168-174 of Wright's Deposition (DN 113-2) shall not be sealed.

5.      Defendants' Motion for Leave to File Sur-Reply (DN 126) and Plaintiffs' Cross-Motion for Leave to File Sur-Reply (DN 128) are **DENIED**.

6.      Defendants' Motion to Strike (DN 129) is **DENIED**.

Greg N. Stivers, Chief Judge
United States District Court

June 17, 2022

cc:     counsel of record